ANTHONY J. MAZZUCA, Plaintiff-Appellant, *v.* DAVID EATMON *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 62121

Opinion filed February 1, 1977.

Robert H. Joyce and Mark A. Lies, II, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Norman E. Goldman, of Spivack & Lasky, of Chicago, for appellees.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

Plaintiff, Anthony J. Mazzuca, obtained a judgment against David Eatmon in the amount of $60,000. The complaint alleged that Eatmon negligently operated his motor vehicle on December 19, 1968, causing injuries to plaintiff. Defendant Eatmon did not appear for deposition nor for trial. The automobile operated by Eatmon on December 19, 1968, had been leased to Eatmon by the Hertz Corporation (Hertz).

Mazzuca served garnishment summons on Hertz and Royal Globe Insurance Company (Royal Globe). Royal Globe had issued an insurance policy to Hertz covering automobiles leased by Hertz. This policy was in force and effect on the date of the occurrence. Hertz and Royal Globe denied possession, custody or control of any property belonging to the judgment debtor, Eatmon. It was stipulated that the sole issue in dispute was the cooperation or lack of cooperation of the insured, David Eatmon, under the Royal Globe policy in question. After a hearing the trial court entered a judgment in favor of defendants Hertz and Royal Globe and against the plaintiff. Plaintiff's appeal seeks to reverse that judgment.

In urging reversal plaintiff alleges that Hertz and Royal Globe did not establish by a preponderance of the evidence the affirmative defense of noncooperation under the terms of the insurance policy. The evidence reveals that David Eatmon rented a car from Hertz on November 22, 1968. On March 31, 1969, a lawsuit was filed alleging that plaintiff was injured as a result of the negligent conduct of David Eatmon in operating the vehicle. Summons was served on David Eatmon April 8, 1969. On April 25, 1969, plaintiff's attorney sent a letter to Hertz which was received by Hertz on April 29. That letter stated that there was an accident at 32 N. Pulaski Road in the city of Chicago and that David Eatmon was driving a Hertz vehicle leased from Hertz at O'Hare International Airport on November 22 and returned to Hertz on December 22. James T. Bland, a claims manager for Hertz, testified that he kept all the records of claims filed and that he had the record on this claim. Mr. Bland was not the claims manager at the time of the occurrence. He stated that the file was opened on May 8, 1969, and that on May 8 the matter was referred to C. G. Caster & Co., independent adjusters for the purposes of investigation. The claim file did not contain an accident report.

Valvard Blazek, an employee of C. G. Caster & Co., testified that he was assigned to make an investigation on May 8, 1969. He was given an address of David Eatmon at 4458 West Wilcox in Chicago. The record reveals that on this date David Eatmon filed a *pro se* appearance listing his address as 1355 South Tripp. On May 9, Blazek went to the Wilcox address and could not find him in the apartment building. He went to a grocery store and a neighborhood tavern to see if anyone knew David Eatmon but was unsuccessful. He wrote to the post office trying to get a forwarding address but the post office "didn't seem to give us the information we needed." The witness went to the Illinois Youth Commission on May 26 and was informed that David Eatmon was employed at a branch office at 1355 South Tripp. The witness went to that office and was informed that while David Eatmon did work there he had irregular hours and it was difficult to say when he would be in the office.

The witness left a business card with the request that David Eatmon telephone him about the automobile accident. No phone call was ever received. At an unspecified date he returned to the Illinois Youth Commission and found that David Eatmon had been discharged. The witness obtained an address, 1652 West 13th Street, and a telephone number and was told that if David Eatmon was not there to ask for Ida Brown. The witness telephoned that number several times and talked to Ida Brown. He was not able to locate David Eatmon as a result of that call. The witness never went to 1652 West 13th Street. He received a post office box number from the postmaster, but never sent a letter there. He also received an address, 3839 West Wilcox, which he did not investigate. The witness did not try to contact Eatmon after July of 1969. The witness did not look up driver's license records nor did he determine Eatmon's social security number. He did not check with any credit agency. He procured the accident report from the police department but did not obtain any other information. He was not able to find any of David Eatmon's relatives. He did not place an ad in the newspaper. His office did not attempt to contact Mr. Eatmon by letter or other written communication. The witness spent a total of 5¼ hours trying to locate Mr. Eatmon.

A year later, on August 11, 1970, Hertz sent a letter to Eatmon at 4458 West *Wolcott* rather than Wilcox. That letter was returned indicating that there was no such number. On October 27, 1970, a letter was sent to David Eatmon at 1355 South Tripp. That letter was also returned to sender.

The next investigation occurred in August, 1972, almost two years after Hertz sent the letters and almost three years after the investigation by Blazek. At that time, Gunther Polak was engaged to locate David Eatmon. He went to the original Wilcox Avenue address and found that David Eatmon was no longer there. He did locate David Eatmon's father and brother who resided at 3839 West Wilcox, the address obtained from the post office by Blazek three years earlier in 1969. He was unable to learn the whereabouts of David Eatmon from any information he could gather from them. He went to the police department and found that there was a warrant for a bad check charge and fraudulent use of a Sears credit card. He went to Sears but did not see any report or file that Sears had on David Eatmon. He went to the area of Washington and Homan where he checked a service station but was unable to locate him. The witness did not check with the Secretary of State's office for driver's license address information. He did not check his last known place of employment nor did he check for any possible prior employers. His entire investigation took place in the month of August of 1972 and his report was submitted on August 30, 1972.

In urging that there has been a sufficient amount of evidence to sustain the affirmative defense for noncooperation, Hertz points out that David Eatmon did not notify Hertz of the accident; the matter was promptly referred to an investigator after the receipt of the letter from the attorney advising that a suit had been filed and a prompt investigation was made; letters were sent to David Eatmon; and Mr. Polak was engaged in August of 1972 to make an extensive investigation.

Defendants assert that, having used reasonable diligence in attempting to contact Eatmon, they have established by a preponderance of the evidence the affirmative defense of noncooperation and are not liable on the insurance policy.

■■ It is agreed that in Illinois, the burden of proof is on the insurance company to establish the affirmative defense of a breach of the cooperation clause in an insurance policy. (*State Farm Fire & Casualty Co. v. First National Bank & Trust Co.* (1972), 2 Ill. App. 3d 768, 277 N.E.2d 536; *Penn v. Progressive General Insurance Co.* (1966), 74 Ill. App. 2d 32, 219 N.E.2d 857.) Such a burden is met by showing that the insurance company

"* * * exercised a reasonable degree of diligence in seeking the insured's attendance at the trial and that his failure to appear was due to a refusal to cooperate. [Citations.]" (*Chertack v. Santangelo* (1972), 6 Ill. App. 3d 201, 205, 285 N.E.2d 209.)

Whether a reasonable degree of diligence was exercised and whether an insured's failure to appear could reasonably be attributed to a refusal to cooperate are determined by an examination of the facts and circumstances of each case.

In the instant case, there were a number of occasions upon which investigators hired by Hertz failed to follow up leads they had received on Eatmon's whereabouts. Hertz attempted to contact Eatmon by mail on two occasions prior to trial: on August 11, 1970, a letter was sent to 4458 West Wolcott, an address apparently inaccurately transcribed from the Rental Agreement on which Eatmon had listed his address as 4458 West *Wilcox* in November of 1968; and on October 27, 1970, a letter was sent to 1355 South Tripp, an address of the Illinois Youth Commission where Eatmon *had* worked, but which an investigator for Hertz had found to be a dead end some 17 months previously. In August and September 1972, trial counsel for Hertz mailed letters to Eatmon at three addresses turned up by the 1969 investigation, two of which had already been proved fruitless; the third was a post office box obtained from Eatmon's change of address information at the post office in 1969. None of the letters reached Eatmon. Most significantly, the address at 3839 West Wilcox which was obtained in 1969, was not investigated until 1972. The address proved to be the residence of Eatmon's father and brother.

Hertz and Royal Globe rely on *Gallaway v. Schied* (1966), 73 Ill. App.

2d 116, 219 N.E.2d 718, as controlling on the issue of noncooperation of the insured and what burden an insurance company must meet before invoking such a defense. However, a critical difference between the *Gallaway* case and the case at hand is the fact that in *Gallaway*, the insured had been in touch with her insurance company and had apparently been receiving the letters sent to her at the address she had listed in her insurance policy and on the accident report which she had filed. It was only after two notices of the time set for her deposition went unheeded that the insurer was informed by the insured's mother that the insured had left town two weeks previously. From that time on, all correspondence between counsel for the insurance company or the company itself and the insured was returned unclaimed. The court, in noting that lack of cooperation must be "substantial or material," stated that whether the conduct or actions of the insured did create such substantial or material breach was a question of fact to be determined from the peculiar circumstances of each case. (*Gallaway v. Schied* (1966), 73 Ill. App. 2d 116, 122, 219 N.E.2d 718.) Upon the facts before it, the court, characterizing the insured's disappearance as "wilful" (*Gallaway* at 127), affirmed the trial court's determination that the defendant proved a breach of the cooperation clause. Wilfully choosing not to cooperate after being contacted by the insurer and aiding to a limited extent constituted a substantial and material lack of cooperation, affecting the insurer and its rights. *Gallaway*, at 123.

In the instant case, however, there was no initial contact by the insurer. Eatmon may or may not have reported the accident when he returned the car; no evidence was introduced to show what, if any, procedure was established to process accident reports or transmit them from the check-in area at O'Hare Field to the Hertz claims office. Even assuming that Eatmon did not report the accident, it is difficult to infer a refusal to cooperate in view of the fact that he did file a *pro se* appearance after being served with the summons and complaint in the original lawsuit. There is no evidence that Eatmon affirmatively and wilfully chose not to cooperate. The terms of the policy pertinent to the rental transaction and the incorporation clause were printed on the reverse side of the Rental Agreement, in what might generously be considered to be small print. The cooperation clause was set out not in the Rental Agreement, but in the policy between Royal Globe and Hertz, available for inspection at the main offices of Hertz upon the customer's request. The clause contained in the Royal Globe policy states:

> "The insured shall cooperate with the company and, *upon the company's request*, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits."

It would be reasonable to assume that Eatmon was unaware of any

contractual obligation to cooperate. There is no evidence that Eatmon ever became aware of any such obligation, and then wilfully refused to comply. His failure to cooperate can as easily be attributed to lack of notice as to what was expected from him.

■■ The efforts expended by the garnishee defendants in attempting to locate Eatmon consisted of approximately 5¼ hours spread over three months in 1969 and a somewhat more extensive, though belated, effort, begun some three years later in 1972. Both investigations involved leads which were not followed up, and avenues which were never explored. While it cannot be stated with any amount of certainty that such efforts would have yielded more positive results, their absence indicates that the investigation which did take place was little more than a cursory, *pro forma* procedure. Such efforts can scarcely be said to establish the exercise of a reasonable degree of diligence necessary to invoke the affirmative defense of noncooperation. Nothing less than a clear showing of reasonable diligence can justify allowing defendants to avoid liability on the policy of insurance. We find that defendants have not met this burden.

The judgment in favor of garnishee defendants Hertz and Royal Globe is therefore reversed.

Reversed.

DOWNING, P. J., and STAMOS, J., concur.